Filed 11/20/20  In re E.F. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.F., a Person Coming Under the Juvenile Court Law. | |
| | D077339 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15343A) |
| v. | |
| Michelle F., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Reversed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Joanne Willis Newton, under appointment by the Court of Appeal, for the minor, E.F.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Senior Deputy County Counsel, for Plaintiff and Respondent.

Michelle F. (Mother) appeals from a judgment of the juvenile court terminating her parental rights to her adopted daughter, E.F.  Mother asserts the juvenile court erred by refusing to require E.F. to testify at the Welfare and Institutions Code[1] section 366.26 hearing and by terminating her parental rights.  She asserts that there was not a reasonable likelihood that E.F. would be adopted and that the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i), precluded the termination of her parental rights.  We find no error in the juvenile court's refusal to require E.F. to testify or to apply the beneficial parent-child relationship exception.

With respect to the adoptability finding, the juvenile court found that E.F. was specifically adoptable based on the likelihood that the foster family that she was living with at the time of the hearing would adopt her.  However, while the present appeal was pending, the parties informed this court that E.F. has been moved out of that placement and is now residing in a residential facility.  In light of that development, the San Diego Health and Human Services Agency (the Agency) concedes that the matter should be remanded to the juvenile court for a new assessment report and section 366.26 hearing.  We agree and therefore reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

E.F. was first placed into protective custody in January 2011, when she was one year old, due to domestic violence between her biological mother and

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

father.  After spending several months in each of two foster homes, E.F. was placed with Mother and Mother's husband (Father) on December 15, 2011.

*Events Leading to the Juvenile Dependency Petition*

Mother had three other children whom she had adopted out of foster care, and the Agency received several reports raising concerns about emotional abuse and neglect of those children while E.F. was in Mother's care.  Despite these ongoing concerns, Mother and Father adopted E.F. in July 2013, following the termination of the parental rights of her biological parents.

In November 2013, Father was arrested for possession of child pornography.[2]  After Father's arrest, Mother became highly agitated and dysregulated and the Agency received a report indicating that all of the children, including E.F., were at risk of emotional abuse and neglect.  Mother screamed at the children in front of E.F.'s therapist and told E.F. that Mother was going to move to Utah without the children.  She also displayed explosive and verbally abusive behavior at the children's school.

In June 2014, the state revoked Mother's foster parent license based on the charges against Father and several substantiated reports against Mother.  Among other issues, the reports indicated that Mother was hostile and disruptive in a court proceeding, demonstrated bizarre behavior with community resource personnel, made disparaging remarks about the children in their presence, and broke a child's school project in front of the child at school.

The Agency continued to receive reports questioning Mother's ability to care for the children, and specifically E.F., throughout 2016 and 2017.  One

---

[2]    Father passed away prior to the section 366.26 hearing from which Mother now appeals and his rights are not at issue in this case.  He is discussed only to the extent relevant to Mother's case.

report indicated that Mother hit E.F. and pulled on her hair and ears, and that Mother had said that she knew the system and knew how not to leave marks. Another report indicated that Mother made E.F. sleep under the stairs and made E.F. go outside in the cold wearing only a diaper when she wet the bed.

In September 2016, Mother brought E.F. into the school office and stated that she was planning to take E.F. to the hospital because E.F. had tried to push her sister down the stairs. Mother stated that she did not want E.F. anymore. She then left with E.F. but called the school shortly thereafter and said that E.F. was "flipping out." The staff convinced Mother to return and noted that E.F. was sitting in the car calmly when she and Mother arrived. Mother stated that E.F. was a danger to herself or others and left again, but then called the school and said that she was bringing E.F. back. The school told Mother that E.F. could not return to school given Mother's statements and that Mother should take E.F. to the hospital if she felt that E.F. posed a danger to herself or others. Mother returned, left E.F. in the school office, and drove off, but then came back to retrieve E.F. a few minutes later, after the school staff informed her that leaving E.F. at the school would be considered abandonment. In addition, the school indicated that Mother was not cooperative in addressing E.F.'s mental health issues and that Mother had a pattern of removing or interfering with E.F.'s support system whenever E.F. began to make progress.

The following April, Mother called the police and reported that E.F. had run away. Upon investigation, it was determined that E.F. was upset that Mother did not get her an ice cream and had said that she would run away. Mother grabbed E.F. by the hair and legs and pushed her out the front door. When the police arrived, Mother had two sleeping pills in her hand and

4

stated that she intended to give one to E.F. However, the pills were not prescribed to E.F. The police detained Mother and transported her to the emergency room for a mental evaluation. Mother was placed on a section 5150 hold and an alternate caregiver stayed with the children.

On July 25, 2017, the Agency received a report that Mother had called a crisis line and stated that E.F. had threatened to kill herself, that she felt unsafe in the home with E.F., and that she had locked E.F. in her room for everyone's safety. Mother refused to call law enforcement and said that she would just call Child Welfare Services and ask them to come take E.F. On July 28, an Agency representative spoke with the team at a crisis center. The crisis center personnel reported that Mother had asked them to take E.F. and had said that she was extremely overwhelmed and did not want E.F. in her home any longer. Mother told the crisis team that E.F. was sleeping, that she had locked E.F. up, and that she had given E.F. extra medication that was not supposed to be given until the evening. A member of the response team was able to speak to E.F. E.F. stated that she did not want to "be in the room anymore or wake up again in the lock up room." Mother said that the lock up room was for the safety of everyone else in the home, but when the crisis workers suggested that Mother call 9-1-1, she refused.

A couple of weeks later, the Agency received another report that E.F. had attacked Mother with a knife and a pair of scissors and Mother said that she would not call the crisis line or law enforcement because "they will not do anything." In addition, the reporter indicated that Mother said that she had been locking E.F. in the "quiet room" since May, and that Mother had stated that E.F. manipulated her to get out by saying that she was thirsty or had to use the restroom.

An Agency social worker spoke with E.F. in the home on July 31. E.F. stated there was nothing that she did not like about living in the home. When asked what happens when she gets into trouble, E.F. said that she goes to the quiet room. She said that she stays in the quiet room for 16 minutes and that she does not fall asleep in the quiet room because she is too scared. The social worker spoke with E.F. again at school on August 23. E.F. immediately asked whether she was going to "adoptions" or "foster homes." She said she wanted to go to the hospital to get better so Mother would not get mad at her. She also said that she wanted more attention and that she wished she was disabled like her siblings so that she could get a lot of attention like them.

The Agency social worker also spoke with a neighbor, who indicated that Mother frequently yelled at E.F. The neighbor said that she heard E.F. ask Mother whether Mother would want her if she went to the hospital to get better, and heard Mother respond that "she would not want her and she has been trying to get rid of her and has been asking for her to be taken away or for her to be put in a hospital." The neighbor also heard Mother tell E.F. that she did not like her and would not miss her, and that they did not have any good memories together.

*The Juvenile Dependency Petition*

On August 24, 2017, the Agency filed a juvenile dependency petition on behalf of E.F. Father's whereabouts were unknown at time of detention, but he was subsequently located in federal custody.

In a Detention Report dated August 25, 2017, the Agency noted that E.F.'s doctor, therapist, and psychiatrist had each indicated that Mother appeared to be a primary cause of E.F.'s declining behavior. E.F.'s primary care physician indicated that Mother was not very nurturing or loving, that

6

she was instead abrasive and threatening, and that she had no real sense of how to calm E.F. down. He reported that E.F. did not act out in his presence.

E.F. had been diagnosed with encopresis and enuresis[3] and, although E.F. was nearly eight years old, Mother continued to put her in diapers. E.F.'s physician believed that E.F.'s toileting issues were psychological. He did not think that E.F. was mentally ill but said that Mother seemed to want to believe that she was, and that E.F. was convinced that she was mentally ill because of Mother's actions. He explained that E.F. did have some attachment issues, but that those issues could not be addressed when E.F. could not attach to Mother.

E.F.'s therapist said that Mother claimed that E.F. was violent and that E.F. had attacked her with knives or scissors, but Mother refused to call the police or discuss a safety plan. The therapist indicated that E.F. was calm during their sessions but that Mother often appeared to be upset, overwhelmed, and angry. She said that Mother wanted her to write a letter recommending that E.F. be hospitalized or placed in residential care and was upset that she refused.

E.F.'s psychiatrist, Dr. Chou, indicated that E.F. had Reactive Attachment Disorder (RAD) and said that Mother had difficulties trying to cope with her. He said that E.F. was extremely anxious and felt insecure in her relationship with Mother. He had written a letter recommending that E.F. be placed in a residential program or psychiatric hospital and said that he had done so because the situation in the home was so volatile and he believed that Mother needed an opportunity to stabilize herself. He further indicated that Mother regularly told E.F. that she did not love her, and that

---

3    Enuresis and encopresis are conditions characterized by involuntary urination and defecation, respectively.

it was not safe or healthy for E.F. to continue to hear that. However, once Dr. Chou learned that the Agency was considering court intervention, he indicated that he did not think E.F. should be sent to another foster home, given her history with RAD. He subsequently submitted a second letter in which he recommended that E.F. remain with Mother, with continued intensive family therapy.

Another therapist who worked with the family, Dr. Hershey, indicted that he was aware that Mother had a "quiet room" and that he had seen photographs of it. He explained that a "quiet room" was supposed to be a safe space where an over-stimulated child could be "brought down", with parental supervision. He further indicated that the room Mother used was located in a space under the stairs and was approximately 9 feet by 5 feet. He said that he recommended that Mother leave E.F. in the room for 25 to 30 minutes, because that is how long it takes the body to "regulate down", but he did not think that Mother had left E.F. in the room for more than a "handful" of minutes. He believed that the door did not have a lock but thought that it should have one, so that Mother would not have to stand next to the door to ensure that E.F. did not leave. He denied any knowledge of Mother making inappropriate comments to E.F.

Staff members at E.F.'s school indicated that E.F. was not displaying the behaviors that Mother had reported to the school, and that E.F. did not wear diapers at school. The school health clerk indicated that E.F. had only one toileting accident in the previous eight months, and that she believed that accident had occurred on the way home because E.F. was dry when she left school. She also said that Mother would scold E.F. in front of the school staff and other students and that E.F. did not like to be embarrassed in that way. Another staff member told the Agency that Mother had shown her a

8

video in which she and another caregiver were barricading E.F. with their bodies and trying to force E.F. into the room under the stairs. She said that E.F. had tried to walk away but Mother and the caregiver would not let her go.

A caregiver who occasionally stayed in the home with the children while Mother was away reported that she was aware that Mother put diapers on E.F. but said that she did not know why. She said that E.F. did not have accidents or need help with the restroom.

*Initial Removal from Mother*

On August 25, 2017, the juvenile court found that the Agency had made a prima facie showing on the petition and detained E.F. The court granted Mother liberal supervised visitation.

E.F. was placed at Polinsky Children's Center (PCC). The staff at PCC did not notice any of the behaviors that Mother had reported. In a letter submitted to the Agency on August 28, 2017, E.F.'s physician indicated that the past few years had been "very turbulent" and reiterated that he believed that Mother was contributing to E.F.'s worsening behavior. He said, "[M]other appears to have an interest [in] seeing [E.F.] as mentally fragile and having psychiatric diagnoses. I have not seen such behavior in the office and such behaviors did not happen at school to any great degree." He further indicated that Mother had shown him videos of E.F. exhibiting problematic behaviors while at home and that, "[a] common theme in these videos is the very high anxiety, tension and yelling and negative parenting and approaches that persist through the altercations."

Dr. Chou submitted a letter to the juvenile court in September 2017. He said that E.F. was struggling with RAD and that additional transitions between caregivers would likely worsen the condition. He further stated that

9

E.F. would be best served by living with Mother and receiving frequent attachment focused therapy so that they could work on improving their relationship. He said that Mother had been consistent with their appointments and that he believed she was dedicated and motivated to obtain the best care for E.F. Mother also submitted a letter to the juvenile court in which she indicated that E.F. was acting out as a result of RAD.

Mother continued to request that E.F. be placed in a residential setting, and not in a foster home. She admitted to the Agency that she would put E.F. in the "quiet room" or "go to room", but that she had done so only with the approval of Dr. Chou and Dr. Hershey. She said that the room did not have a lock but that she would lean against the door so that E.F. could not get out until she calmed down. Mother denied telling E.F. that she did not want her but said that E.F. often said she did not want to be sent back or separated from the family.

During a social history interview in September 2017, Mother told the Agency social worker that she had been diagnosed with anxiety in 2008 and depression in 2013. When asked about therapy, Mother stated that she saw Dr. Chou and Dr. Hershey, as well as a psychiatrist. She stated that she had read books on parenting a child with RAD and had signed up for an online course about RAD. When asked why E.F. was involved with the Agency, Mother said that it was because a "ticked off caregiver" who could not handle E.F.'s behaviors had reported that Mother emotionally abused E.F. When asked what she needed to do to make it safe for E.F. to return to the family home, Mother said that she needed to "continue to do what I'm doing. Probably work with Dr. [Hershey] more and Dr. Chou more." She also stated that she should give E.F. attention when she feels that she needs it and hug

10

her instead of using the "go to room." The Agency opined that Mother did not have insight into her own behavior or the impact that it had on the children.

E.F. continued to do well in school and the school principal reported that she did not have any behavioral issues. The principal stated, "the child that we see at school is not the child that the parent sees at home." She explained that she had been a principal for 25 years and described Mother's behavior as "pretty extreme." The principal also raised a concern that E.F. was overmedicated and said that she was "like a little zombie" at school. The vice principal reported that Mother was coming into the school office nearly every day, often angry, and that Mother had sent her approximately 173 "rambling e-mails that don't make sense" between April 2016 and October 2017. Mother also called the Agency social worker frequently, as often as five times per day, to complain.

*First Foster Family Placement*[4]

By October 10, 2017, E.F. was living in a confidential licensed foster home. The Agency reported that she was doing well in the placement, had no behavioral concerns, and was having fewer toileting accidents.

E.F. had regular visits with Mother and her siblings. In a jurisdiction and disposition report dated October 10, 2017, an Agency social worker noted that E.F. was sometimes resistant to seeing Mother but would set aside her feelings toward Mother in order to see her siblings. The Agency noted that there were some strengths in E.F.'s relationship with Mother, including moments in which Mother and E.F. showed affection toward one another, but

---

[4] The record indicates E.F. has had a total of 13 placements. This includes placements before Mother adopted E.F. and the times that E.F. was placed at PCC between foster families. For clarity and to maintain confidentiality, we refer to the placements during this case sequentially, starting with the "first foster family placement".

that there were also several areas of concern.  Mother was overbearing and anxious and tended to project her feelings onto E.F.  For example, Mother would remind E.F. of her fears instead of comforting her or encouraging her to overcome them.  Mother also fixated on E.F.'s homework and told E.F. that she was going to fail her classes.  This caused E.F. great stress, but Mother did not seem to notice.

In an addendum report dated October 19, the Agency reported that E.F. had begun wetting herself on the way to and from school but noted that she was not having accidents at school or in the foster home.  The school office staff indicated that E.F. was spending approximately three to four hours on the bus each day and that she had expressed a desire to use the bathroom during the commute.

E.F. started attending a school closer to her foster home shortly thereafter, and did not have any toileting accidents between late October and early December.  In a report dated December 4, 2017, E.F.'s therapist noted that E.F. had previously been diagnosed with RAD and enuresis and encopresis but indicated that she did not believe that E.F. currently met the criteria for those diagnoses.

*Contested Jurisdiction and Disposition Hearing*

The juvenile court held a contested jurisdiction and disposition hearing on January 10, 2018.

In an addendum report submitted that day, the Agency indicated that Mother was trying to change her behavior and her interactions with E.F. so that they were more positive.  E.F.'s foster parent reported some behavioral concerns but indicated that they were not as severe as what Mother had previously reported.  Father returned to the family home in December 2017 and the foster parent indicated that E.F.'s problematic behaviors increased

12

after she had contact with Father. The Agency further reported that E.F. was undergoing a medication evaluation. Her psychiatrist said that she was on a large number of medications for her age and that it would be ideal to take her off of any that she did not need.

The juvenile court made true findings and sustained the petition. The court ordered a "transition plan" for Mother. Under the plan, Mother was to begin having short, unsupervised community visits with E.F. The court granted the Agency discretion, with the concurrence of minor's counsel, to increase the number of visits and to permit overnights and an extended 60-day visit.

*Extended Home Visit with Mother*

The Agency approved an extended overnight visit in the family home in March 2018, during E.F.'s spring break. During the visit, E.F.'s foster parent had a family emergency that required him to remain out of state for an extended period of time. Rather than place E.F. in a new foster home, the Agency approved an emergency trial home visit with Mother.

On June 6, Mother reported that E.F. was having a tantrum in the car that created an unsafe situation. Mother called law enforcement and drove E.F. to Mother's therapist's office but was eventually able to calm E.F. down. Mother's therapist reported that the incident started because E.F. wanted a pastry during a car ride and Mother refused, despite knowing that hunger and car rides were two of E.F.'s triggers. The therapist indicated that Mother had reported that E.F. was binge eating and food hoarding, that the therapist had told Mother that those behaviors were coping techniques for anxiety, and that Mother had expressed irritation and anger rather than concern for E.F.'s well-being. E.F. was also having increased incidents of enuresis and Mother

13

similarly expressed anger and frustration and did not demonstrate any insight into how the enuresis was related to E.F.'s increased anxiety.

On June 7, 2018, Mother took E.F. to a behavioral health center and reported that E.F. was having an uncontrollable tantrum. The center noted that E.F. was calm and refused to admit her.

On June 20, Mother called law enforcement in response to another tantrum. Law enforcement officers took E.F. to the Rady Children's hospital for an evaluation. E.F. was released early the next morning after the hospital determined that she was not a danger to herself or others. A member of the PERT team that responded to the incident later told the Agency that Mother was "very emotionally dysregulated" and did not appear to be concerned about E.F.'s safety. The individual said that E.F. was "really shut down" around Mother but became more talkative in the patrol car, away from Mother.

*Second Removal from Mother's Care*

On July 9, 2018, the Agency filed a section 387 petition seeking to remove E.F. from Mother's care. The petition alleged that Mother's mental health had deteriorated, and that Mother had admitted that she was not equipped to meet E.F.'s special needs. Mother continued to insist that E.F. required residential treatment but the Agency noted that E.F.'s foster parent had not witnessed any of the behaviors that Mother had reported.

In a status report dated July 10, 2018, the Agency reported that E.F.'s negative behaviors, including hitting, kicking, biting, and making statements of self-harm had increased dramatically over the preceding 30-day period. The Agency opined that the situation was detrimental to E.F., that Mother had not gained any insight as to how her actions played a role in E.F.'s

14

negative behaviors, and that in-home services were not sufficient to address the situation.

The Agency reported that E.F. had been participating in therapy but that she had attended only three sessions in the 60-day period that she had been in Mother's care. In the discharge summary, the therapist noted that E.F. had expressed a desire to continue with therapy but that Mother continued to make strong statements indicating that E.F. would not return. E.F. indicated that she had felt more anger after starting the trial visit with Mother and that the family dynamics prompted and escalated her outbursts. The therapist noted that E.F.'s body language had "withered" over the course of her three sessions with E.F. after the trial visit began and stated that E.F. had slumped shoulders, made little eye contact, and did not appear as emotionally strong or confident as she had previously. When asked to identify the safe people in her life, E.F identified her foster parent and the therapist but struggled to identify anyone else and declined to identify Mother as a safe person when the therapist offered that suggestion. The therapist ultimately concluded that E.F. suffered from psychological abuse and neglect.

The therapist indicated that E.F. had difficulty discussing her past experiences but did incorporate them into therapeutic play. E.F. had several incidents of enuresis during therapeutic play, often tied to heightened anxiety. The therapist diagnosed E.F. with enuresis but noted that the cause appeared to be emotional and not physiological.

E.F. had transitioned to a new therapist but had completed only two sessions by the time of the Agency's July 10 status report. Nevertheless, the new therapist also expressed concerns over Mother's behaviors.

15

*Second Foster Family Placement*

The juvenile court granted the petition, removed E.F. from the family home, and granted Mother supervised visitation. E.F. was placed in a new foster home on July 12, 2018, but the foster family requested that E.F. be moved shortly thereafter, on July 26. Their stated concerns included difficulty getting E.F. to therapy appointments and school, enuresis, and behavioral issues including lying and arguing with another child in the home.

E.F. underwent a psychological evaluation in late July. The evaluator ruled out RAD but stated that if E.F. did have RAD, Mother's behaviors "would certainly exacerbate the condition as they would be detrimental to attachment."

*Third Foster Family Placement*

E.F. was placed with another foster family on August 21, 2018.

A Foster Family Agency (FFA) social worker observed a visit between Mother and E.F. on September 6, 2018. The social worker indicated that E.F. became anxious and "elevated" as soon as Mother arrived. Mother asked E.F. whether she was going to live with the foster family permanently and had to be reminded not to discuss the case with her. Mother also brought E.F. gifts, in violation of the rules, but then told E.F. that she could not take the gifts with her because she was not going home with Mother. The social worker indicated that there were frequent and escalating power struggles between Mother and E.F. throughout the visit. Mother was permitted to call E.F. on the phone twice a week, but E.F. was reluctant to speak with Mother and often made excuses so as not to have to talk to her.

In mid-September, the Agency reported that E.F. was stabilizing in her most recent foster placement. Her enuresis had decreased, and her anxiety medication had been significantly reduced. The caregivers indicated that

16

they were open to adopting E.F. and were committed to meeting her needs. They also said that E.F. did not want to attend visits with her family, often had meltdowns before the visits, and regressed or became defiant after visits with Mother. In October, the caregivers noted that E.F.'s behaviors were cyclical based on visits. She would have meltdowns and wet herself for several days after visits and then would be happy and positive and would go several days without an accident before the next visit.

On October 21, 2018, the foster parents reported that E.F. had a difficult weekend after meeting with her attorney regarding an upcoming hearing, and that E.F. had hit their other child in the face with a hard plastic toy during a tantrum.

In an addendum report dated October 22, 2018, the Agency raised additional concerns regarding Mother's behavior at visits. The visitation monitor reported that Mother continued to assist E.F. with wiping after E.F. used the restroom. E.F.'s older siblings needed help with toileting due to their disabilities and, although E.F. did not, Mother stated that she needed to treat all of her children the same in the name of "fairness." The Agency noted that Mother's insistence in doing so was hampering E.F.'s development, and that E.F. was not fully toilet trained, despite being physically and developmentally able. The visitation monitor also noted that Mother would rock E.F. while holding her like a baby, and the caregivers noted that E.F. would often talk in baby talk after visits.

The Agency further reported that E.F. refused two visits with Mother at the end of October and that Mother expressed frustration that the Agency was allowing E.F. to make decisions about her attendance at visits.

17

The juvenile court held a 12-month review hearing on November 5, 2018. The court found that Mother had made minimal progress and that it was not likely that E.F. would be returned home by the next review hearing.

*Change in Placement and Termination of Reunification Services*

That December, the third foster family asked the Agency to remove E.F. due to her behaviors and she was returned to PCC on December 24, 2018. Although E.F. had refused to attend a number of visits with Mother prior to the placement change, she did visit with Mother while at PCC. On January 25, 2019, E.F. told the Agency social worker that she did not want to be adopted again and that she would live with Mother if she had the choice.

In January and February of 2019, the Agency received reports alleging general neglect of E.F.'s older siblings by Mother. Around the same time, Mother underwent a neuropsychological evaluation. The examiner concluded that Mother was suffering from a cognitive disorder and personality change due to a traumatic brain injury that occurred when she was a teenager. The evaluator opined that it was unlikely that additional treatments or services would be effective in changing Mother's behaviors or resolving the difficulties between Mother and E.F. The Agency acknowledged that Mother's behaviors made more sense in light of the evaluation, but also noted that the behaviors were nevertheless emotionally damaging to E.F. Based on these issues and Mother's demonstrated lack of progress since E.F.'s removal, the Agency recommended that the juvenile court terminate services for Mother and concluded that there was not a substantial probability that E.F. could safely return to Mother's care.

*Fourth Foster Placement*

18

E.F. was placed in a new foster home on February 25, 2019. In April, the Agency reported that she was doing well in the placement, with the exception of some stealing, lying, and food-based issues.

On April 5, 2019, the juvenile court terminated family reunification services. Mother continued to have visits with E.F. During the visits, Mother attempted to manipulate E.F. by bringing personal items but telling E.F. that she could not have them at the new foster home.

In July, the caregivers reported that E.F. was having encopretic accidents surrounding visits with mother. They reported that E.F. would play with her feces and that she had also rubbed her feces on the couch and encouraged the family dog to roll in her feces. E.F. typically had two to three accidents per week but had only one accident during weeks that she did not have a visit with Mother. E.F.'s physician opined that the visits with Mother were rekindling distress and preventing E.F. from progressing with her therapy. The caregivers indicated that they were interested in adopting E.F. but expressed concerns about E.F.'s behaviors following visits with Mother.

Around the same time, E.F. began to decline to attend visits with Mother. Her caretakers indicated that she would have an accident each time a social worker contacted her about a visit with Mother. They further reported that E.F. would say, "I refuse to listen to my body" and "Why didn't my mom teach me how to be potty trained?" E.F. said that she missed Mother but was scared to see her because of the past abuse and the fact that seeing Mother made her soil herself.

On August 24, 2019, the caregivers notified the Agency that they could no longer care for E.F. They said that they cared for her but that the ongoing encopresis and enuresis was a concern for the household. They agreed to keep E.F. in their home until the Agency found a new placement but reported

that E.F. continued to decline and that E.F. had an encopresis episode each time a social worker contacted her about having a visit with Mother.

*Fifth Foster Family Placement and Request to Suspend Visitation with Mother*

The Agency found another potential placement for E.F. in September 2019. At the Agency's request and pending the filing of a formal section 388 petition, the juvenile court suspended Mother's visits with E.F. to give the new placement the maximum chance for viability.

The Agency filed its section 388 petition requesting termination of Mother's visits with E.F. shortly thereafter, on October 11. The Agency explained that E.F. had been refusing visits with Mother for some time and that the previous visits had negatively impacted her progress. Mother was overbearing, made disparaging remarks to E.F., and spoke to E.F. about the case in an inappropriate manner. As a result, E.F. returned from visits in a confused state. She would mutter words and refuse to make eye contact, and had increased stomach aches and encopretic accidents. Several foster placements had noted E.F.'s regressions after visits.

On October 18, 2019, E.F. was placed with her fifth foster family since her original removal from Mother's care. She had not had contact with Mother since June. The juvenile court granted the Agency's request to suspend visits with Mother on October 21, but set the matter for a contested hearing together with the section 366.26 hearing. E.F. continued to struggle with encopresis and enuresis but she appeared happy in the placement and her problematic behaviors decreased. The caregivers had previous experience with children with encopresis, wanted to adopt E.F., and stated, "This feels like it is the perfect match." In an addendum report dated November 21, 2019, the Agency recommended that the juvenile court terminate Mother's parental rights to free E.F. for adoption.

On November 27, 2019, E.F. called Mother several times and left a voice message. She said that she missed Mother and did not want Mother to leave her. She later told the social worker that she missed Mother, but that Mother made her "worse." When the social worker asked what E.F. meant, she said, "I don't want to talk about it. I'll talk when I'm ready." E.F.'s therapist indicated that holidays tend to trigger emotions in foster children and that it was common for them to miss parents they had been removed from during that time. Mother filed a request for renewed contact with E.F. based on the calls.

*Termination of Mother's Parental Rights*

In an addendum report dated January 17, 2020, the Agency reported that the allegations of emotional abuse and general neglect by Mother toward E.F.'s adoptive siblings had been substantiated and that the older children had been removed from Mother's care. E.F. continued to state that she wanted to be adopted by her foster family and the foster family remained committed to adopting her. The Agency continued to recommend that the juvenile court terminate Mother's parental rights so that E.F. could be adopted.

The juvenile court held a section 366.26 hearing on January 27, 2020. Mother requested that E.F. testify and the Agency objected. The Agency submitted a report from E.F.'s therapist indicating that E.F. became dysregulated and had tantrums that included crying and yelling anytime that court was mentioned. In addition, the stress caused E.F. to regress and display increased episodes of enuresis and encopresis. The Agency also submitted a letter from E.F.'s pediatrician in which he indicated that even the thought of having to appear in court was triggering regression in E.F.'s behavior and that requiring her to appear in court would result in additional

trauma to her. He therefore strongly opposed requiring E.F. to appear in court in any capacity. The court denied Mother's request to have E.F. testify.

At the conclusion of the hearing, the juvenile court found that E.F. was specifically adoptable and that neither the sibling nor the beneficial parent-child relationship exception applied. The court therefore terminated Mother's parental rights.

Mother appeals.

## DISCUSSION

*I. The Juvenile Court Did Not Abuse its Discretion by Denying Mother's Request That E.F. Testify*

The juvenile court is obliged to consider the wishes of the child at a section 366.26 hearing and a parent's right to call or cross-examine witnesses generally includes a right to call the minor child to testify. (See *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1085-1086 (*Jennifer J.*); § 366.26, subds. (h)(1), (2).) However, the juvenile court may allow the minor to testify in chambers, outside the presence of the minor's parent or parents, and may decline to compel the testimony of the minor altogether if there is evidence that testifying will cause the minor psychological harm. (§ 366.26, subd. (h)(3)(A); *Jennifer J., supra,* at pp. 1086, 1088-1089; *In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1086 (*Daniela G.*).) When considering whether to require a minor to testify, the court must carefully weigh the necessity of the testimony against the potential harm to the child, and should consider: (1) whether the desires and wishes of the minor can be presented absent live testimony; (2) whether the minor's testimony is material to the issues to be resolved; and (3) whether the minor would be psychologically damaged by testifying. (*Jennifer J., supra,* at p. 1089.)

We review the juvenile court's decision to exclude a minor's testimony based on the potential for psychological harm for an abuse of discretion and

review any challenges to the factual findings underlying the juvenile court's ruling for substantial evidence. (*Daniela G., supra,* 23 Cal.App.5th at p. 1090; *Jennifer J., supra,* 8 Cal.App.4th at pp. 1086, 1088.)

The juvenile court concluded that any potential benefit from requiring E.F. to testify would be outweighed by the harm that it would cause her. The Agency included E.F.'s statements of her wishes and desires in their reports and E.F.'s statements had been largely consistent throughout the pendency of the case. The court noted that it had reviewed the reports containing E.F.'s statements and was very familiar with the case. Thus, any benefit from requiring E.F. to testify would be marginal. Further, the court found that requiring E.F. to testify, even in chambers, would be detrimental to her because she suffered from post-traumatic stress disorder (PTSD) and there was evidence that the court proceedings were a trigger for her. The court therefore denied Mother's request to require E.F. to testify. We find no abuse of discretion in the juvenile court's ruling.

As in *Jennifer J.,* the crucial issue in this case was whether continued contact with Mother would be beneficial or detrimental to E.F. (See *Jennifer J., supra,* 8 Cal.App.4th at p. 1087-1088.) E.F. had a long history of well-documented adverse reactions to Mother, and several doctors and therapists agreed that her interactions with Mother were causing her continued psychological and emotional harm. Although there was some indication that E.F.'s behaviors were related to RAD, the experts agreed that, at the very least, Mother's behavior exacerbated whatever attachment issues E.F. may have had. More recently, E.F. had displayed similar adverse reactions to mere discussions regarding contact with Mother or the associated court proceedings and began to have tantrums and an increase in incidents of enuresis and encopresis whenever those topics were raised.

23

By contrast, there was little the court stood to learn from E.F.'s live testimony. E.F.'s negative interactions with Mother were well-documented and, having presided over the case for years, the juvenile court was well aware of E.F.'s various statements regarding Mother. E.F sometimes vacillated in her desire to see Mother but had consistently refused visits with Mother for several months prior to the section 366.26 hearing. On two separate occasions, E.F. told the social worker that she missed Mother, but that she was scared to see Mother because the visits made her soil herself or made her "worse." E.F. resisted further discussion of the issue and often had a negative reaction to the social worker's inquiries concerning Mother. There was no reason to believe that E.F. would have provided any additional relevant testimony if the court had compelled her to testify.

Mother concedes that there was evidence that E.F. would experience "some level of trauma" if she were required to testify, but asserts that any harm would be temporary and was outweighed by Mother's due process right to present her case. To the contrary, E.F.'s behaviors had been reoccurring for years and were indicative of deep-seated stress and trauma. At least two experts indicated that requiring E.F. to participate in the court proceedings would further traumatize her. (See *In re Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1085.)

Mother asserts that the juvenile court improperly relied on the Agency's reports as evidence of E.F.'s wishes and desires, and that E.F.'s calls to her on November 27, shortly before the section 366.26 hearing, were inconsistent with the Agency's conclusions. To the contrary, E.F.'s statement to the social worker regarding the calls—that she missed Mother but that Mother made her "worse"—was entirely consistent with her previous statements. Moreover, E.F.'s therapist indicated that it was typical for foster

24

children to miss their former parents during the holidays. Thus, it is not surprising that E.F. sometimes missed Mother, and the fact that she did does not undermine her other statements. Regardless, the juvenile court was aware of the calls and E.F.'s statements, and there is no indication that E.F. would have said anything different if the court had required her to testify.

Like the court in *Jennifer J.*, the juvenile court in this case properly weighed the evidence indicating that E.F. would suffer psychological damage if required to testify against the low probability that her testimony would be beneficial to resolving any material issue, and appropriately declined Mother's request to require E.F. to testify at the hearing. (See *Jennifer J., supra,* 8 Cal.App.4th at pp. 1088-1089.)

Mother argues that *In re Amy M.* (1991) 232 Cal.App.3d 849 (*Amy M.*), in which the appellate court determined that the juvenile court should have required the minor to testify, should control here. We disagree.

 In *Amy M.*, the parties disputed jurisdiction and presented competing experts as to whether the minor had suffered emotional damage inflicted by his parents or rather, merely as a result of the removal. (See *Amy M., supra,* 232 Cal.App.3d at pp. 864-865.) In that context, the appellate court determined that the minor's testimony was crucial, because it had the potential to directly verify or refute the expert testimony. (*Id.* at p. 865.) In addition, the court noted that "there was no other testimony or statements which could have been admitted into evidence to substitute for [the minor's] testimony." (*Id.* at p. 868.)

By contrast, in this case, while Dr. Chou indicated that E.F. would be best served by continued attachment focused therapy with Mother and that additional placements would be detrimental to E.F., all of the experts, including Dr. Chou, agreed that Mother behaved inappropriately with E.F.

25

and that Mother's behavior was at least a significant cause, if not the sole cause, of E.F.'s declining behavior. Although the relationship between E.F. and Mother was complex, the juvenile court was very familiar with the case, was aware of E.F.'s various statements regarding contact with Mother, and was able to weigh the experts' opinions. Thus, it is unlikely that E.F.'s live testimony would have helped resolve the fundamental issue of whether it would be beneficial or detrimental for E.F. to maintain a relationship with Mother.

Mother also asserts that, like the parents in *Amy M.*, she and her attorney were denied access to E.F. prior to the section 366.26 hearing. (See *Amy M., supra,* 232 Cal.App.3d at p. 868.) Mother was denied access to E.F. based on the juvenile court's order suspending visits between Mother and E.F., and that order is not at issue here. With respect to Mother's counsel, Mother does not indicate what her counsel would have asked E.F. if given the opportunity and there is no indication that E.F. would have said anything that she had not already said to the social workers. Indeed, the juvenile court invited Mother's counsel to renew her request to meet with E.F. if she could establish the need for specific information regarding a particular issue that arose during the proceedings, but Mother's counsel did not do so.

Accordingly, we conclude that *Amy M.* is not controlling here, and that the juvenile court did not abuse its discretion by declining Mother's request that E.F. be required to testify at trial.

## II. Termination of Parental Rights

We turn next to Mother's assertion that the juvenile court erred by terminating her parental rights. Mother asserts that there was insufficient evidence to support the juvenile court's finding that E.F. was likely to be adopted within a reasonable time and that the court should have applied the

26

beneficial parent-child relationship exception in section 366.26, subdivision (c)(1)(B)(i), to preclude the termination of her parental rights.

*A. The Juvenile Court's Finding that E.F. Was Likely to Be Adopted by a Specific Family Must be Reconsidered in Light of Significant Post-Judgment Developments*

Once the juvenile court terminates reunification services in a dependency proceeding, the focus shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

At this point, "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care." (*In re Fernando M., supra*, 138 Cal.App.4th at p. 534.) Of those options, adoption is the permanent plan preferred by the Legislature, even though it requires termination of the natural parents' legal rights to the child. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 573.) At the same time, though, section 366.26, subdivision (c)(1), requires the juvenile court to find, "by a clear and convincing standard, that it is likely the child will be adopted," before terminating parental rights and ordering that the child be placed for adoption. (*Ibid.*)

When determining whether the child is adoptable, the juvenile court typically focuses on whether the child's age, physical condition, and emotional health make it difficult to find a person willing to adopt that child within a reasonable time. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*); *In re Brian P.* (2002) 99 Cal.App.4th 616, 624 (*Brian P.*).) It is not necessary that the child already be placed in a prospective adoptive home,

and the court may find that the child is generally adoptable without examining the suitability of a specific prospective adoptive home. (*Brian P., supra,* at p. 624; *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) However, in some cases, where the minor might not be considered generally adoptable "due to age, poor physical health, physical disability, or emotional instability," the juvenile court may nevertheless conclude that the minor is likely to be adopted based on the identification of a specific prospective adoptive family that has expressed a willingness to adopt the minor. (*Sarah M., supra,* at p. 1650.)

We affirm the juvenile court's finding of adoptability on appeal if there is substantial evidence to support a finding, by clear and convincing evidence, that the child is either generally or specifically adoptable. (See *Sarah M., supra,* 22 Cal.App.4th at pp. 1649-1651). The California Supreme Court recently clarified, "when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (See *In Re Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

The juvenile court found that E.F. was specifically adoptable. The court noted the "described commitment" and experience of the specific foster family that E.F. was placed with at the time of the section 366.26 hearing, as well as E.F.'s statement that she was comfortable in the home, and concluded, "I do find that she is specifically adoptable." The juvenile court did not make any findings on the record indicating that E.F. was generally adoptable. Although the court used the more general statutory language in its written order, finding "by clear and convincing evidence, it is likely that

28

said child will be adopted if parental rights are terminated," it is clear from the record that this finding was based on the willingness of a specifically identified family to adopt E.F.

However, during the pendency of the present appeal, this court learned that E.F.'s placement with that family ended in April 2020 and that E.F. has been residing in a residential facility since that time.[5] Upon learning of this development, we asked the parties to submit additional briefing addressing what impact, if any, E.F.'s removal from the prospective adoptive home had with respect to the juvenile court's findings regarding adoptability. In its response, the Agency states that E.F. "has not yet been placed in a new adoptive home, although the Agency is looking at three adoptive placement options," and acknowledges that the matter should be remanded to the juvenile court for a new assessment and section 366.26 hearing. We agree.

Appellate courts have, at times, deemed it appropriate to take subsequent developments in juvenile dependency cases into account. (See *In re Elise K.* (1982) 33 Cal.3d 138, 139 (*Elise K.*); *In re B.D.* (2019) 35 Cal.App.5th 803, 818 (*B.D.*).) We conclude that it is appropriate to do so here given the history of this case, the facts surrounding the juvenile court's adoptability finding, and the significance of the subsequent change in placement.

E.F. had been placed with the prospective adoptive family for only three months at the time of the section 366.26 hearing and this family was the fifth foster family that E.F. had been placed with since her removal from

---

[5]     On this court's own motion, we take judicial notice of the minute orders of the juvenile court in the underlying matter, dated July 27, 2020, which confirm that E.F. was placed in a licensed group home or short-term residential facility and referred to the Agency for adoptive placement. (Evid. Code, § 452, subd. (d).)

Mother's care in August 2018. Although the juvenile court ultimately found that E.F. was likely to be adopted by that family, it did so only after some significant hesitation. The court noted that the short length of the placement, the number of previously disrupted placements, and the "many factors surrounding the reasons" for the previous disruptions presented abundant reason for pause, and stated, "we really don't know how this is going to pan out." Despite those concerns, the court indicated that it did not want to eliminate hope for E.F. and that it was encouraged by the stated commitment and experience of the prospective adoptive family. The court therefore proceeded to find that E.F. was specifically adoptable.

Unfortunately, the issues that caused the juvenile court to be concerned about the placement came to fruition; the placement with the prospective adoptive family was ultimately not successful, and E.F. was removed from that placement. In light of that development, the juvenile court's finding that E.F. was likely to be adopted by that specific prospective adoptive family cannot be sustained. (See *Elise K., supra,* 33 Cal.3d at p. 187; *B.D., supra,* 35 Cal.App.5th at p. 818.)

Minor's counsel contends that this case is distinguishable from *B.D.* We disagree. In *B.D.*, the parents appealed from an order of the juvenile court terminating their parental rights and noted that the minor had subsequently been removed from the foster home where he was placed at the time of the section 366.26 hearing. (*Id.* at pp. 808, 810.) The mother asked the court to consider post-judgment evidence, including the reasons for the removal and evidence indicating that the Agency had withheld relevant information about the prospective foster parent from the juvenile court. (*Id.* at p. 810, 814-815.) The appellate court granted the mother's request and ultimately reversed the juvenile court's ruling based on the Agency's failure

30

to provide a "full, fair and evenhanded preadoption study." (*Id*. at pp. 818, 822, 824.)

Minor's counsel asserts that the post-judgment evidence that the *B.D.* court considered existed at the time of the section 366.26. hearing, while the evidence at issue in this case did not. However, the *B.D.* court also considered the change in placement itself, which occurred after the section 366.26 hearing. (See *B.D., supra,* 35 Cal.App.5th at pp. 810, 826 [noting that the minor was left parentless].) Regardless, the *B.D.* court accepted the post-judgment evidence because it concluded, as we do here, that it was a rare case where post-judgment evidence undermined the juvenile court's finding that the minor was likely to be adopted. (*In re B.D., supra,* 35 Cal.App.5th at p. 818; see also *Elise K., supra,* 33 Cal.3d at p. 139 [reversing a ruling terminating parental rights based on a post-judgment change in placement and stipulation of the parties].)

Minor's counsel also asserts that E.F. was, and remains, generally adoptable, and that this court may make that finding on appeal based on the evidence presented in the juvenile court. We disagree. The juvenile court did not make such a finding and, even if such a finding could be implied, it would not be supported by substantial evidence. (See *Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1651). Minor's counsel relies on the social worker's statements indicating that E.F. was generally adoptable, but those statements are conclusory and are not sufficient to support a finding under the clear and convincing evidence standard. (See *In Re Conservatorship of O.B., supra,* 9 Cal.5th 989 at p. 1005.) In both statements, the social worker listed several of E.F.'s positive qualities but did not address the serious behavioral issues that had resulted in the termination of several previous placements. Further, the Agency did not provide any information regarding

31

the number or existence of available prospective foster families that would be likely to adopt a child with E.F.'s characteristics.

We acknowledge that a foster parent's "willingness to adopt generally indicates the [child] is likely to be adopted within a reasonable time either by the [foster] parent *or by some other family*." (*In re Sarah M.*, *supra,* 33 Cal.App.4th at p. 1650.) However, the juvenile court found that E.F. was adoptable based specifically on the prospective adoptive family's experience and willingness to handle E.F.'s identified emotional and behavioral issues; we now know that even that placement was not successful. Moreover, although the Agency indicates that it is looking at some potential placement options, E.F. has been in a residential facility for nearly six months and has not been placed with another prospective adoptive family. Accordingly, we cannot conclude that the willingness of that specific family to adopt E.F. is sufficient to support a finding that E.F. is generally adoptable, particularly where the juvenile court did not make such a finding in the first instance.

Finally, minor's counsel asserts that, given the lengthy history of emotional abuse inflicted on E.F. by Mother, termination of Mother's parental rights in favor of adoption continues to be in E.F.'s best interest. However, that issue is not properly before this court. Instead, we must conclude that the juvenile court's previous finding that E.F. was specifically adoptable cannot be sustained in light of the subsequent failure of the placement with the specific prospective adoptive family. We therefore remand the matter to the juvenile court with instructions to reconsider the issue of adoptability.

*B. The Juvenile Court Did Not Err by Refusing to Apply the Beneficial Parent-Child Relationship Exception*

Although we have determined that the juvenile court's termination of parental rights must be reconsidered, we address Mother's argument

32

regarding the applicability of the beneficial parent-child relationship exception and conclude that the juvenile court did not err in determining that the exception did not apply.[6]

Courts have interpreted the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i), as requiring a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home." (*In re Autumn H., supra*, 27 Cal.App.4th at 575.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

A parent claiming the beneficial parent-child relationship exception has the burden of establishing that it applies and must prove that the child has a significant and positive emotional attachment to the parent. (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039; *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail

---

[6] We address this issue because it is possible that the juvenile court will find that E.F. is likely to be adopted despite the recent failure of her placement in the prospective adoptive home. We acknowledge that this issue will be moot if the juvenile court determines that E.F. is not likely to be adopted.

over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the parent, or pleasant, even frequent, visits. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re C.F., supra,* 193 Cal.App.4th at p. 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists"].) Rather, the parent must play a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child. (*In re C.F., supra*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, *supra*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a parental relationship is necessary' "].)

We apply a hybrid standard of review when reviewing the juvenile court's ruling regarding the applicability of the parent-child relationship exception on appeal. (*In re J.C., supra,* 226 Cal.App.4th at pp. 530-531.) We review the juvenile court's findings regarding the existence of a beneficial parental relationship for substantial evidence and review the juvenile court's determination as to whether there is a compelling reason for concluding the termination of parental rights would be detrimental to the child for an abuse of discretion. (*Ibid*.; *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; see also *Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [practical difference between pure substantial evidence standard of review and hybrid standard of review is insignificant].)

There was ample evidence that Mother's relationship with E.F. was not beneficial and in fact, that the relationship was detrimental to E.F. As discussed, *ante*, E.F. had a long history of well-document adverse reactions to Mother and several doctors and therapists agreed that her interactions with Mother were causing her continued psychological and emotional harm. Indeed, the negative impacts of her contact with Mother were so severe that the juvenile court had suspended contact between Mother and E.F. prior to the combined section 388 and 366.26 hearings. Moreover, Mother's older children were also removed from her care due to emotional abuse and neglect, and a neuropsychological evaluation indicated that it was unlikely that additional treatments or services would be effective in changing Mother's problematic behaviors.

Accordingly, substantial evidence supports the juvenile court's finding that Mother did not have a beneficial relationship with E.F. and we find no abuse of discretion in the juvenile court's refusal to apply the parental relationship exception to preclude the termination of Mother's parental rights.

## DISPOSITION

The judgment is reversed and the matter is remanded to the juvenile court with instructions for the court to determine whether E.F. is likely to be adopted despite the recent failure of her placement in a prospective adoptive home.

AARON, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.